UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

YOOKEL, INC.,                                    **MEMORANDUM & ORDER**

              Plaintiff,               20-CV-4513 (KAM) (CLP)

     - against -

UNITED STATES STEEL CORP.,

              Defendant.

--------------------------------------X

KIYO A. MATSUMOTO, United States District Judge:

       The Keystone Industrial Port Complex ("KIPC") is an industrial park located on the site of a former steel mill in Fairless Hills, Pennsylvania. In 2007, Plaintiff Yookel, Inc. purchased a parcel of property at the KIPC from Defendant United States Steel Corporation. As part of that transaction, Yookel acquired "ancillary rights" that permitted it to use certain railroad tracks leading to its property. Yookel claims that U.S. Steel did not disclose that a third party — namely, CSX Transportation, Inc., the parent company of Consolidated Rail Corporation ("Conrail") — would assess "demurrage fees" for failing to remove rail cars from the tracks in a timely manner. Based on U.S. Steel's alleged failure to disclose and reimburse Yookel for the demurrage fees, the amended complaint asserts claims for fraudulent inducement, breach of contract, unjust enrichment, and a declaratory judgment.

1

U.S. Steel now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons set forth below, Defendant's motion is GRANTED.

## BACKGROUND

The Keystone Industrial Port Complex consists of industrial warehouses that are serviced by an internal rail system, known as the Fairless Rail Yard. (ECF No. 13 ("Am. Compl.") ¶ 15.) The Fairless Rail Yard includes "common area rails" that are owned by U.S. Steel. (*Id.*; *see also* ECF No. 21 ("Am. Answer") ¶ 15.)

On September 18, 2007, Yookel purchased property within the KIPC from U.S. Steel for $6,390,000. (Am. Compl. ¶ 17; ECF No. 21-1 ("Real Estate Agreement").)[1] Pursuant to the Real Estate Agreement, Yookel obtained "ancillary rights" that included "irrevocable, non-exclusive rights for rail access[] and railroad staging" on the common area rails. (Am. Compl. ¶ 18; Real Estate Agreement § 1.01; *see id.*, Ex. K (depicting Yookel's ancillary rights).) In using the common area rails, Yookel agreed that it would "utilize the switching carrier designated" by U.S. Steel. (Real Estate Agreement § 1.01.) Yookel also acknowledged that its ancillary rights were "subject to . . . [U.S. Steel's] rights," as well as the rights of U.S. Steel's "agents, assignees, carriers,

---

[1] Although the Real Estate Agreement lists non-party Samax Enterprises, Inc. as a buyer (*see* Real Estate Agreement at 1), only Yookel is recorded on the deed for the property. (Am. Compl. ¶ 17 n.1.)

contractors[,] and all other persons lawfully using the Ancillary Rights . . . ."  (*Id.* § 1.01(A).)  Finally, Yookel agreed that "railcar storage, by [Yookel], shall be limited only to [its] Premises."  (*Id.* § 1.01.)

As part of the real estate transaction, U.S. Steel also granted Yookel an easement over a small area surrounding Yookel's property.  (Am. Compl. ¶ 30; ECF No. 21-3 ("Rail Easement"); *see* Real Estate Agreement, Ex. K1 (depicting easement area).)  The easement disclosed that "[t]he Rail System is currently maintained for [U.S. Steel] through an operating agreement with Conrail." (Rail Easement at 3.)  Specifically, U.S. Steel's predecessor in interest — USX Corporation — entered into a Rail Operating Service Agreement with Conrail that became effective on January 1, 2000. (Am. Compl. ¶ 57; ECF No. 21-2 ("Rail Operating Service Agreement").  Pursuant to the Rail Operating Service Agreement, Conrail acquired "the right to operate [Fairless Rail Yard]" and was "solely responsible for negotiating suitable commercial arrangements . . . with Shippers for line-haul, terminal[,] and accessorial freight charges . . . ."  (Am. Compl. ¶¶ 57, 59; Rail Operating Service Agreement §§ 3, 10.)

To compensate U.S. Steel for "maintain[ing]" the common area rails, the Real Estate Agreement provided that Yookel would pay U.S. Steel $500 per acre, per year.  (Am. Compl. ¶ 21; Real Estate Agreement § 1.01(B).)  This maintenance fee increased by 3%

per year. (*Id.*) However, if Yookel or any of its lessees "discontinue[d] payment" of the maintenance fee, Yookel's ancillary rights would be terminated. (Am. Compl. ¶ 22; Real Estate Agreement § 1.01(B).)

In October 2014, Yookel leased its property at the KIPC to non-party B&J Group, Inc. (Am. Compl. ¶ 40.) As part of their negotiations, Yookel represented to B&J that B&J was entitled to use the common area rails pursuant to the ancillary rights. (*Id.* ¶ 41.) After B&J started using the common area rails in October 2014, however, Conrail's parent company — CSX Transportation, Inc. — sent invoices to B&J for demurrage fees. (*Id.* ¶ 43.) As required by federal law, "[r]ailroads charge shippers and receivers of freight 'demurrage' fees if the shippers or receivers detain freight cars on the rails beyond a designated number of days." *CSX Transp. Co. v. Novolog Bucks County*, 502 F.3d 247, 251 n.1 (3d Cir. 2007) (citation omitted); *see, e.g.*, 49 U.S.C. § 10746; 49 C.F.R. §§ 1333.1-1333.3. B&J disputed the demurrage fees, which ultimately totaled $80,750, arguing that "neither the Real Estate Agreement nor the Rail Easement required payment of any fees to any third party." (Am. Compl. ¶¶ 53, 55.)

CSX ultimately commenced litigation against B&J to recover the demurrage fees in the U.S. District Court for the Eastern District of Pennsylvania. (*Id.* ¶ 54.) On May 31, 2019, the district court granted CSX's motion for summary judgment,

4

concluding that CSX could assess demurrage fees against B&J pursuant to a public tariff of which B&J had actual notice. *CSX Transp., Inc. v. B&J Grp., Inc.*, 381 F. Supp. 3d 438, 442-43 (E.D. Pa. 2019). The district court awarded CSX $353,979.69, representing the balance of the demurrage fees, late fees, finance charges, costs, and attorney's fees. (Am. Compl. ¶ 67.) Following the district court's judgment in the Pennsylvania action, B&J sought reimbursement from its lessor, Yookel. (*Id.* ¶ 69.) Yookel represents that it has paid B&J in partial satisfaction of the Pennsylvania judgment and will continue to pay B&J until the judgment is satisfied. (*Id.* ¶ 70.)

On August 26, 2020, Yookel commenced this action against U.S. Steel in the Supreme Court of New York for Kings County, arguing that U.S. Steel is required to pay Yookel for the costs of the Pennsylvania judgment pursuant to the Real Estate Agreement. (ECF No. 1-2.) U.S. Steel removed the case to this court on September 23, 2020. (ECF No. 1.) After each party amended its pleading (*see* Am. Compl.; Am. Answer), U.S. Steel requested a pre-motion conference to move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (ECF No. 22.) The court held a premotion conference on February 12, 2021 and heard oral

argument on the fully briefed motion on February 10, 2022. (2/12/21 Minute Entry; 2/10/22 Minute Entry.)[2]

**LEGAL STANDARD**

"After the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion [to dismiss] for failure to state a claim." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (citation omitted). As a result, to survive a motion for judgment on the pleadings, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citation omitted). "[J]udgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery, even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial." *Id.* (alteration original; citation omitted).

When analyzing a Rule 12(c) motion, the court may consider "all documents that qualify as part of the non-movant's 'pleading,' including (1) the complaint *or* answer, (2) documents

---

[2] At the premotion conference, the court questioned whether this action should be transferred to the Eastern District of Pennsylvania in the interests of justice pursuant to 28 U.S.C. § 1404(a). Both parties confirmed that they consent to the court adjudicating the instant motion, and therefore the court understands that U.S. Steel does not dispute venue in the Eastern District of New York. Because the court grants U.S. Steel's motion for judgment on the pleadings, it need not consider the issue of transferring venue.

attached to the pleading, (3) documents incorporated by reference in or integral to the pleading, and (4) matters of which the court may take judicial notice." *Id.* at 306.  The court accordingly considers the Real Estate Agreement, Rail Easement, and Rail Operating Service Agreement, which were incorporated by reference in the amended complaint. (*See, e.g.*, Am. Compl. ¶¶ 17, 30, 57.)

**DISCUSSION**

**I.   Choice of Law**

"A federal court sitting in diversity applies the choice-of-law rules of the forum state." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) (citation omitted).  Applying New York's choice of law rules, the court agrees with U.S. Steel that Pennsylvania's substantive law applies to Yookel's claims for breach of contract and a declaratory judgment, and that New York's substantive law applies to Yookel's claims for fraudulent inducement and unjust enrichment.  (*See* ECF No. 26-1 ("Def.'s Mem.") at 6-9.)

"Generally, courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction." *Welsbach Elec. Corp. v. MasTec N.A., Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006).  Here, the parties agreed to a choice of law clause providing that the Real Estate Agreement "shall be governed by and performed in accordance with the laws of the Commonwealth of Pennsylvania . . . ."  (Real Estate Agreement

§ 25.)  The parties' choice of Pennsylvania law bears a reasonable relationship to the Real Estate Agreement because the property and dispute at issue are located in Pennsylvania.

Under New York law, however, the Real Estate Agreement's choice of law provision "governs only a cause of action sounding in contract, not one sounding in tort." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir. 1997).  By definition, Yookel's claim for breach of contract sounds in contract.  Similarly, Yookel's claim for declaratory relief asks the court to declare the parties' rights and obligations under the Real Estate Agreement.  *See* 10B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2756 ("On the substantive issues that may arise in an action for a declaratory judgment, the rule of *Erie Railroad Company v. Tompkins* controls, when it is applicable." (citation omitted)).  Accordingly, the court will apply Pennsylvania's substantive law in adjudicating Yookel's claims for breach of contract and a declaratory judgment.[3]

---

[3] However, the court disagrees with U.S. Steel's suggestion that Pennsylvania law provides the applicable procedural standards for Yookel's claim for a declaratory judgment.  (Def.'s Mem. at 10 (citing Pennsylvania law).)  "Courts in this circuit and elsewhere . . . have concluded that the federal Declaratory Judgment Act, *see* 28 U.S.C. § 2201, rather than an otherwise applicable state declaratory judgment act, governs in diversity actions under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)." *Bruno v. Casella Waste Sys., Inc.*, 616 F. App'x 20, 21 n.2 (2d Cir. 2015); *see also, e.g.*, *Lighton Indus., Inc. v. Allied World Nat'l Assurance Co.*, 348 F. Supp. 3d 167, 182 (E.D.N.Y. 2018) ("The Declaratory Judgment Act — not state declaratory judgment law — provides the procedural mechanism for granting declaratory relief in federal diversity cases." (citation omitted)).

Yookel's claims for fraudulent inducement and unjust enrichment, by contrast, do not sound in contract and thus are not governed by the Real Estate Agreement's choice of law provision. *See, e.g.*, *Dessert Beauty, Inc. v. Platinum Funding Corp.*, 2006 WL 3780902, at *5 (S.D.N.Y. Dec. 26, 2006) ("[T]he choice of law provision does not determine which state's law should apply to the tort claim [for fraudulent inducement].")[4]; *FCX Solar, LLC v. FTC Solar, Inc.*, 2022 WL 355606, at *7 (S.D.N.Y. Feb. 7, 2022) ("[U]njust enrichment is an equitable claim that is outside the scope of the contract's choice-of-law provision and may be governed by the law of a different state." (citation omitted)). Without an applicable choice of law provision, the court conducts an interest analysis under New York law to determine which jurisdiction has the greatest interest in resolving the particular claim. *See, e.g.*, *Intellivision v. Microsoft Corp.*, 2008 WL 3884382, at *5 (S.D.N.Y. Aug. 20, 2008) (fraudulent inducement); *Scherie Murray for Congress v. Shannon*, 2021 WL 4480573, at *6 (E.D.N.Y. Sept.

---

[4] It is true that a choice of law provision may apply to tort claims like fraudulent inducement that "aris[e] incident to the contract," so long as the express language of the provision is "sufficiently broad as to encompass the entire relationship between the contracting parties." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (quotations and citation omitted). However, because the choice of law provision in this case states only that the Real Estate Agreement "shall be governed by and performed in accordance with" Pennsylvania law (Real Estate Agreement § 25), it is not broad enough to cover Yookel's tort claim for fraudulent inducement. *Krock*, 97 F.3d at 645 (holding that a materially identical choice of law provision did not encompass tort claim for fraudulent misrepresentation).

30, 2021) (unjust enrichment).[5]   As part of this analysis, the court looks to "the parties' domiciles and the locus of the tort," with the relative importance of those factors being determined by "the nature of the law in question."   *Krock*, 97 F.3d at 646 (citation omitted).

Where, as here, the parties are domiciled in different states, "the locus of the tort will almost always be determinative in cases involving conduct-regulating laws."   *Id.*   Yookel's claim for fraudulent inducement involves a conduct regulating law.   *See, e.g.*, *Chigirinskiy v. Panchenkova*, 2015 WL 1454646, at *6 n.7 (S.D.N.Y. Mar. 31, 2015).   Similarly, Yookel's claim for unjust enrichment involves a conduct regulating law because the claim is also premised on U.S. Steel's alleged fraudulent inducement.   *See Related Cos.*, 2019 WL 10947100, at *11 (finding that an unjust enrichment claim was conduct regulating where the claim was premised on fraudulent misrepresentations (citing *Benefield v. Pfizer Inc.*, 103 F. Supp. 3d 449, 458 (S.D.N.Y. 2015))).   As a result, the locus of the alleged tort is determinative.

---

[5] "The question of '[w]hether to apply to an unjust enrichment claim New York's 'center of gravity' choice of law test applicable to contract disputes, or New York's 'interest analysis' test applicable to tort claims, is a matter of debate among district courts in this Circuit." *Related Cos., L.P. v. Ruthling*, 2019 WL 10947100, at *11 (S.D.N.Y. July 23, 2019) (alteration original; citation omitted).   Here, the court applies an interest analysis because Yookel's unjust enrichment claim is premised on the same acts and omissions as Yookel's fraudulent inducement claim.   *Id.* (collecting cases and holding that an unjust enrichment claim premised on allegedly fraudulent conduct "sounds more in tort than it does in contract").

"New York courts consider the locus of a fraud to be the place where the injury was inflicted and not the place where the fraudulent act originated." *H.S.W. Ents., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 142 (S.D.N.Y. 2001).   Yookel was allegedly injured in New York, where it was incorporated and maintains its principal place of business.   (Am. Compl. ¶ 10.) The court thus applies New York law to Yookel's fraudulent inducement and unjust enrichment claims. *See H.S.W. Ents.*, 171 F. Supp. 2d at 142; *Related Cos.*, 2019 WL 10947100, at *11.

Moreover, Yookel's opposition fails to respond to the choice of law arguments contained in U.S. Steel's motion.  Yookel's "'silence on the choice-of-law question' may be understood to 'constitute[] implied consent . . . sufficient to establish choice of law.'" *Related Cos.*, 2019 WL 10947100, at *10 (alterations original; citation omitted); *see also, e.g.*, *Brown v. Twitter*, 2021 WL 3887611, at *7 (S.D.N.Y. Aug. 31, 2021) (finding implied consent where plaintiff "d[id] not proffer any alternative state substantive law").   Accordingly, Yookel's failure to address choice of law provides an alternative basis to apply Pennsylvania's substantive law to the claims for breach of contract and a declaratory judgment, and to apply New York's substantive law to the claims for fraudulent inducement and unjust enrichment.

## II.   Breach of Contract

The amended complaint alleges that U.S. Steel has breached the Real Estate Agreement because CSX (Conrail's parent company) assessed demurrage fees against Yookel's lessee. (Am. Compl. ¶¶ 106-08.)  In Yookel's view, U.S. Steel must reimburse Yookel for the demurrage fees that CSX assessed against its lessee because the Real Estate Agreement only required Yookel to pay the maintenance fee. (*See, e.g.*, *id.* ¶ 45.)  U.S. Steel argues that the amended complaint fails to state a claim for breach of contract because the Real Estate Agreement does not entitle Yookel to recoup demurrage fees and because Yookel's rights under the Real Estate Agreement were terminated for non-payment in 2013. (Def.'s Mem. at 19-21.)

Under Pennsylvania law, "[t]he fundamental rule in interpreting a contract is to ascertain and give effect to the intent of the contracting parties." *Crawford Cent. Sch. Dist. v. Commonwealth*, 888 A.2d 616, 623 (Pa. 2005). "The intent of the parties to a written agreement is embodied in the writing itself." *Id.* The court "may not modify the plain meaning of the contract under the guise of interpretation." *Id.* Instead, "[w]hen contractual language is clear and unequivocal, its meaning must be determined by its contents alone." *Id.* The meaning of an unambiguous contract presents a question of law for the court to

resolve. *Murphy v. Duquesnse Univ. of the Holy Ghost*, 777 A.2d 418, 430 (Pa. 2001).

The court agrees with U.S. Steel that the Real Estate Agreement is unambiguous and does not entitle Yookel to recover demurrage fees assessed by CSX. The Real Estate Agreement's maintenance fee is precisely described: a fee "to maintain the Common Area Rail lines that service the Premises." (Real Estate Agreement § 1.01(B).) In other words, U.S. Steel promised that it would keep the common area rails in good working condition in exchange for a fee. (*See* Rail Easement § 1(D)(c) ("[U.S. Steel] shall cause, to the extent capable, Conrail to keep and maintain the Rail System in unobstructed, good working condition adequate to carry rail cars using the Rail System.").)

Contrary to Yookel's allegations, however, U.S. Steel did not promise that the maintenance fee would be the only expense that Yookel could ever incur in connection with its use of the common area rails. (*See, e.g.*, Am. Compl. ¶ 45 ("Yookel rightfully understood that it was only required to pay U.S. Steel the Maintenance Fee in connection with its use of the Common Area Rails, and was not responsible for any other fees.").) Rather, U.S. Steel merely promised that the maintenance fee would be the only expense that Yookel would incur for U.S. Steel to maintain the common area rails.

13

As provided by federal regulation, demurrage is not a matter of maintenance, but instead "is a charge that both compensates rail carriers for the expenses incurred when rail cars are detained beyond a specified period of time . . . and serves as a penalty for undue car detention to encourage the efficient use of rail cars in the rail network." 49 C.F.R. § 1333.1. As Yookel concedes, demurrage fees are "akin to storage charges." (Am. Compl. ¶ 45; *see id.* ¶¶ 1, 52 (referring to demurrage fees as "storage fees").) And in the Real Estate Agreement, Yookel explicitly promised that "railcar storage, by [Yookel], shall be limited only to the Premises." (Real Estate Agreement § 1.01.)[6] Thus, far from embracing a promise that U.S. Steel would compensate Yookel for demurrage fees, Yookel undertook to refrain from conduct — namely, storing its cars on the common area rails — that could lead to the assessment of demurrage fees.

Reading Yookel's proposed limitation into the Real Estate Agreement — that the existence of the maintenance fee precluded all other fees assessed by third parties — would impermissibly "modify the plain meaning of the contract under the guise of interpretation." *Crawford Cent. Sch. Dist.*, 888 A.2d at 623. Indeed, the parties' integration clause makes clear that the Real

---

[6] Yookel's premises did include its rail easement. (*See* Real Estate Agreement § 1; ECF No. 30 ("Pl.'s Opp'n") at 4.) As discussed below, however, the demurrage fees at issue in this case were not assessed for storing cars within the easement area.

Estate Agreement "constitutes and contains the entire and only Agreement between the parties," and that "[n]o representation, inducement, promise, understanding, condition, or warranty not set forth herein has been made or relied on by either party." (Real Estate Agreement § 22.)  And even if the Real Estate Agreement could be considered ambiguous on the question of demurrage fees, "ambiguities are to be resolved in favor of a reasonable rather than an absurd or unreasonable interpretation." *Starling v. Lake Meade Prop. Owners Ass'n, Inc.*, 162 A.3d 327, 346 (Pa. 2017).  As U.S. Steel notes, the logic of Yookel's position extends beyond demurrage fees assessed by third parties and would hold U.S. Steel liable for a host of expenses incident to Yookel's use of the common area rails, such as utility and tax payments. (Def.'s Mem. at 13, 23.)  The court cannot conclude that the Real Estate Agreement embraces such absurd results merely by granting Yookel the right to use the common area rails.

To be sure, the Real Estate Agreement's ancillary rights granted Yookel "irrevocable, non-exclusive rights for rail access[] and railroad staging." (Real Estate Agreement § 1.01.) But the Real Estate Agreement explicitly provides that Yookel's rights were subject to U.S. Steel's rights; the rights of U.S. Steel's agents, assignees, carriers, and contractors; and the rights of all others lawfully using the common area rails. (Real Estate Agreement § 1.01(A).)  The plain language of the agreement

thus refutes the amended complaint's allegation that Yookel's rights were "unbeknownst to Yookel, subject to Conrail's and CSX's rights to charge the Demurrage Fees." (Am. Compl. ¶ 106.) At the time of the Real Estate Agreement, based on the plain language of the document and the Rail Easement, Yookel knew that its rights were subject to the rights of U.S. Steel's carriers; knew that it was required to use the switching carrier designated by U.S. Steel; and knew that the common area rails were operated by Conrail. (Real Estate Agreement §§ 1.01, 1.01(A); Rail Easement at 3.) Had Yookel consulted federal law, it would have been alerted to the prospect of demurrage fees if Yookel misused the common area rails by failing to remove its cars in a timely manner.[7] In sum, the court concludes that the plain language of the Real Estate Agreement does not entitle Yookel to recoup demurrage fees from U.S. Steel.

In the alternative, U.S. Steel argues that the amended complaint fails to state a breach of contract claim because

---

[7] Yookel claims that it could not have anticipated the prospect of demurrage fees because "demurrage fees cannot legally be charged on private property." (Pl.'s Opp'n at 7 & n. 9 (citing *R.R. Salvage & Restoration, Inc.*, 2010 WL 2836850, at *6 (S.T.B. July 19, 2010)).) The court agrees with U.S. Steel, however, that the Surface Transportation Board's decision in *Railroad Salvage & Restoration* does not save Yookel's claims. (*See* ECF No. 27 ("Def.'s Reply") at 2-3 & n.1.) In that case, the STB considered a rail tariff that, by its own terms, "except[ed] from demurrage charges 'loaded or empty private cars held on private or leased storage tracks.'" 2010 WL 2836850, at *6 (citation omitted). The court's decision in the Pennsylvania litigation demonstrates that the tariff applicable to the demurrage fees assessed against Yookel's lessee contained no such limitation. As the court found in the Eastern District of Pennsylvania case, CSX "ha[d] obtained the right to assess demurrage on tracks owned or operated by Conrail." *B&J Grp., Inc.*, 381 F. Supp. 3d at 440.

Yookel's ancillary rights were terminated for non-payment. (Def.'s Mem. at 20.) In support of this argument, U.S. Steel attaches to its amended answer a termination letter dated February 7, 2013 and a declaration from a former U.S. Steel employee representing that Yookel's ancillary rights were not reinstated. (ECF Nos. 21-4, 21-5.) However, the court concludes that it is inappropriate to consider the termination letter and declaration because they were attached to the *movant*'s pleading. *See Lively*, 6 F.4th at 304 (holding that "the district court erred by relying on several documents attached to [the movant-defendants'] answer in deciding their Rule 12(c) motion without converting it into a motion for summary judgment as required by Rule 12(d)").

In *Lively*, which was issued after completion of the briefing on the instant motion, the Second Circuit clarified the documents that a court may consider on a motion for judgment on the pleadings. *Id.* at 306 ("[C]ourts may consider all documents that qualify as part of the non-movant's 'pleading,' including (1) the complaint *or* answer, (2) documents attached to the pleading, (3) documents incorporated by reference in or integral to the pleading, and (4) matters of which the court may take judicial notice."). The termination letter and declaration are not attached to, or incorporated by reference in, the amended complaint. *See, e.g.*, *Benny v. City of Long Beach*, 2021 WL 4340789, at *10 (E.D.N.Y. Sept. 23, 2021) ("To be incorporated by

reference, the complaint must make a clear, definite[,] and substantial reference to the documents . . . ." (citation omitted)). Nor are the termination letter and declaration integral to the amended complaint because Yookel does not "rel[y] on the terms and effect of [the] document[s]." *Lively*, 6 F.4th at 305 (second alteration original; citation omitted). To the contrary, Yookel's amended complaint presumes that the termination letter and declaration have no effect whatsoever. (*See, e.g.*, Am. Compl. ¶ 105 ("Yookel has annually paid U.S. Steel [the] Maintenance Fee since the execution of the Real Estate Agreement and continues to pay such fee.").) Finally, the termination letter and declaration are not proper subjects of judicial notice because — as the parties' briefing demonstrates — their contents are "subject to reasonable dispute." *Melendez v. City of New York*, 16 F.4th 992, 997 n.2 (2d Cir. 2021) (quoting Fed. R. Evid. 201(b)).

 For similar reasons, the court finds it unnecessary to consider the receipt, invoices, and checks that Yookel attached to its opposition in an effort to demonstrate that the ancillary rights were not terminated in 2013. (*See* ECF Nos. 31-2 to 31-9.) The court has not considered U.S. Steel's termination letter and declaration, but rather has assumed the truth of the amended complaint's allegation that Yookel has paid and continued to pay the maintenance fee in accordance with the Real Estate Agreement. (Am. Compl. ¶ 105.) Nevertheless, even assuming that Yookel's

ancillary rights were not terminated, the plain language of the Real Estate Agreement does not entitle Yookel to recoup demurrage fees from U.S. Steel for the reasons explained above.  Judgment on the pleadings is thus appropriately granted to U.S. Steel on Yookel's breach of contract claim.

## III.   Unjust Enrichment

In addition to a breach of contract claim, the amended complaint asserts a claim for unjust enrichment.  (Am. Compl. ¶¶ 111-19.)  However, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  *Transperfect Global, Inc. v. Lionbridge Techs., Inc.*, 2022 WL 195836, at *11 (S.D.N.Y. Jan. 21, 2022) (quoting *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)).  Yookel's unjust enrichment claim merely duplicates its breach of contract claim because both claims are premised on U.S. Steel's purported obligation to reimburse Yookel for demurrage fees.  (*See* Am. Compl. ¶¶ 106, 113.)  Moreover, "New York law is clear that '[a] claim for unjust enrichment, or quasi contract, may not be maintained where a contract exists between the parties covering the same subject matter.'"  *CF2 Co., Ltd. v. YOCO Inc.*, 2021 WL 4311150, at *2 (S.D.N.Y. Sept. 21, 2021) (alteration original) (quoting *Goldstein v. CIBC World Mkts. Corp.*, 776 N.Y.S.2d 12, 14 (1st Dep't 2004)).  Because the Real Estate Agreement covers the parties' rights and obligations in connection

19

with Yookel's use of the common area rails, Yookel cannot maintain a separate claim for unjust enrichment.

## IV.  **Declaratory Judgment**

Mirroring its breach of contract claim, Yookel requests a declaration that: (1) the Real Estate Agreement and Rail Easement are silent as to any obligation for Yookel to pay fees to third-parties like Conrail; (2) because the Real Estate Agreement and Rail Easement are silent on the question of third-party fees, U.S. Steel must reimburse Yookel for any such fees; and (3) because U.S. Steel has not provided Yookel with the rights that it bargained for, Yookel is no longer obligated to pay the maintenance fee to U.S. Steel.  (Am. Compl. ¶ 86.)  Yookel fails to state a plausible claim for a declaratory judgment for the same reasons that it fails to state a plausible breach of contract claim.  *See, e.g.*, *BSD-360, LLC v. Phil. Indem. Ins. Co.*, 2022 WL 138075, at *11 (E.D. Pa. Jan. 14, 2022) ("Because the Court finds that [plaintiff's] claims do not fall within the coverage of its . . . contract with [defendant] and thus [defendant] did not breach the contract, the Court similarly finds that [plaintiff] is not entitled to declaratory relief."); *PRCM Advisors LLC v. Two Harbors Inv. Corp.*, 2021 WL 2582132, at *19 (S.D.N.Y. June 23, 2021) (dismissing declaratory judgment claim for the same reasons as breach of contract claim); *Beach v. HSBC Bank USA, N.A.*, 2018 WL 3996931, at *7 (S.D.N.Y. Aug. 21, 2018) (same).

As discussed above, the court agrees with Yookel — and U.S. Steel does not dispute (*see* Def.'s Mem. at 12-13) — that the Real Estate Agreement and Rail Easement are silent on the question of third-party fees like demurrage fees.  But the second and third prongs of Yookel's request for a declaratory judgment simply do not follow.  Pennsylvania law and the Real Estate Agreement's integration clause preclude the court from transforming contractual silence into an affirmative obligation for U.S. Steel to pay demurrage fees.  In addition, Yookel fails to state a plausible claim that it did not receive the rights that it bargained for under the Real Estate Agreement.  Yookel does not allege, for example, that U.S. Steel failed to keep the common area rails in good working condition.  And although Yookel had the right to use the common area rails for "rail access[] and railroad staging" (Real Estate Agreement § 1.01.)[8], it did not have the right to store its cars on the rails for as long as it liked.  *See* 49 C.F.R. § 1333.1 (demurrage fees are imposed "when rail cars are

---

[8] Yookel also cites the Rail Easement's provision that, among other purposes, the easement was granted for "the staging and storage of rail cars."  (Rail Easement § 1(D)(a); *see* Pl.'s Opp'n at 5.)  But the relevant agreements make clear that the easement area on which Yookel could store its cars was a small area of property immediately surrounding Yookel's property, and that Yookel's rail access rights encompassed a significantly broader area.  (*See* Real Estate Agreement § 1.01 ("[Yookel] shall have irrevocable, non-exclusive rights for rail access[] and railroad staging as set forth and designated as the Rail Rights, attached hereto as Exhibit K . . . .  In addition, [Yookel] will take ownership of a rail easement as depicted on Exhibit K1 . . . .); *see also id.*, Exs. K, K-1.)  Yookel alleges that the demurrage fees were assessed for B&J's storing of cars on the common area rails, and not for storing cars within the easement area.  (*See* Am. Compl. ¶ 43 ("[U]pon its use of the Common Area Rails, B&J began receiving invoices from CSX . . . for demurrage fees.").)

detained beyond a specified period of time"). Because Yookel's interpretation "is foreclosed by the clear and unambiguous language of [the Real Estate Agreement]," the amended complaint fails to state a plausible claim for declaratory relief. *Gillis v. Respond Power, LLC*, 2018 WL 3427636, at *10 (E.D. Pa. July 16, 2018).

## V.   Fraudulent Inducement

Finally, the amended complaint alleges that U.S. Steel fraudulently induced Yookel to enter into the Real Estate Agreement by failing to disclose that Conrail (through its parent) could assess demurrage fees. (Am. Compl. ¶ 88.) U.S. Steel argues that the amended complaint fails to state a claim for fraudulent inducement because U.S. Steel did not withhold any material information from Yookel and had no duty to disclose the existence of the federal laws governing demurrage fees. (Def.'s Mem. at 16-19.)

"[A]n omission can only serve as the basis of a fraudulent inducement claim where a defendant has a duty to disclose . . . ." *Marquez v. Hoffman*, 2021 WL 1226981, at *33 (S.D.N.Y. Mar. 31, 2021); *see also, e.g.*, *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). "It is well established that, absent a fiduciary relationship between the parties, a duty to disclose arises only under the special facts doctrine where one party's superior knowledge of essential facts

22

renders a transaction without disclosure inherently unfair." *Jana L. v. W. 29th St. Realty Corp.*, 802 N.Y.S.2d 132, 134 (1st Dep't 2005) (quotations and citation omitted).  The court agrees with U.S. Steel that Yookel has failed to adequately plead the existence of a fiduciary relationship or a duty to disclose under the special facts doctrine.

First, a fiduciary relationship "is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions." *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005).  As Yookel notes (*see* Pl.'s Opp'n at 22), determining the existence of a fiduciary relationship can sometimes be a fact-intensive inquiry that is unsuitable for resolution at the pleading stage.  *See, e.g.*, *Menton v. Experian Corp.*, 2003 WL 941388, at *4 (S.D.N.Y. Mar. 6, 2003).  Here, however, the amended complaint fails to allege the existence of a fiduciary relationship or "anything in [Yookel's] dealings with [U.S. Steel] other than an arm's length business transaction." *Sharbat v. Iovance Biotherapeutics, Inc.*, 2022 WL 45062, at *9 (S.D.N.Y. Jan. 5, 2022); *see also, e.g.*, *Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 672 (S.D.N.Y. 2009) (dismissing fraudulent inducement claim when party "failed to allege any facts sufficient to demonstrate that the relationship between the parties was anything other than arm's-

length"). Yookel thus has failed to adequately plead a duty to disclose based on a fiduciary relationship.

Second, to state a claim based on the special facts doctrine, a plaintiff must plead facts showing that (1) the omitted information was "peculiarly within the knowledge" of the defendant and (2) the information could not have been discovered "through the exercise of ordinary intelligence." *Jana L.*, 802 N.Y.S.2d at 135 (quotations and citation omitted). Here, the omitted information — failing to disclose that Conrail (through its parent) could charge demurrage fees if Yookel failed to remove its cars from the common area rails in a timely manner — was not peculiarly within U.S. Steel's knowledge. Although Yookel claims that U.S. Steel had superior knowledge of its relationship with Conrail and the terms of the Rail Operating Service Agreement, Yookel also acknowledges that demurrage fees are ultimately governed by federal law. (Pl.'s Opp'n at 17, 22-23.) The federal laws and regulations governing demurrage fees were readily available to Yookel at the time of the Real Estate Agreement and thus were not peculiarly within U.S. Steel's knowledge. *See, e.g.*, *Bell v. Carey*, 2020 WL 3578150, at *7 (S.D.N.Y. July 1, 2020) (no duty to disclose tax liabilities that were publicly available); *Hahn v. Dewey & Laboeuf Liquidation Trust*, 39 N.Y.S.3d 30, 32 (1st Dep't 2016) (no duty to disclose statute of limitations or legal precedent establishing the accrual of malpractice claims).

At the time it entered into the Real Estate Agreement,
Yookel had sufficient information to understand the prospect of
Conrail (through its parent) charging demurrage fees pursuant to
federal law.  In particular, Yookel knew that it was required to
use the switching carrier designated by U.S. Steel (Real Estate
Agreement § 1.01); that Conrail maintained the common area rails
for U.S. Steel pursuant to an operating agreement (Rail Easement
at 3); and that Yookel's rights in the common area rails were
subject to the rights of others lawfully using the common area
rails (Real Estate Agreement § 1.01(A)).  By Yookel's own account
of the Pennsylvania litigation, the critical fact that entitled
Conrail to assess demurrage fees was that it operated the common
area rails.  (*See* Pl.'s Opp'n at 10 ("[T]he Eastern District of
Pennsylvania ruled that CSX, as Conrail's parent, 'ha[d] obtained
the right to assess demurrage on tracks owned *or operated by*
Conrail." (quoting *B&J Grp., Inc.*, 381 F. Supp. 3d at 440)).)
Yookel thus had information regarding Conrail's entitlement to
assess demurrage fees at the time of the Real Estate Agreement
with U.S. Steel.

Although Yookel claims that U.S. Steel should have
disclosed more about its relationship with Conrail, knowing the
terms of the Rail Operating Service Agreement would not have
materially advanced Yookel's knowledge of the prospect of
demurrage fees.  For example, Yookel identifies the provision of

the Rail Operating Service Agreement stating that Conrail "shall be solely responsible for negotiating suitable commercial arrangements based on common transportation characteristics with Shippers for line-haul, terminal[,] and accessorial freight charges . . . ." (Rail Operating Service Agreement § 10; *see* Pl.'s Opp'n at 8, 15-16.)   But federal law already placed Yookel on notice that a rail carrier like Conrail could assess demurrage fees by contract rather than a public tariff.   49 C.F.R. § 1333.2 ("A serving carrier and its customers . . . may enter into contracts pertaining to demurrage.").   In short, the Rail Operating Service Agreement does not contain anything about demurrage fees that Yookel could not have obtained by consulting federal law.

At a minimum, any information about the prospect of demurrage fees that was peculiarly within U.S. Steel's knowledge could have been discovered by Yookel through the exercise of ordinary diligence and intelligence. *See Jana L.*, 802 N.Y.S.2d at 135.   The Rail Easement specifically disclosed to Yookel that the common area rails were operated for U.S. Steel by Conrail pursuant to an operating agreement.   (Rail Easement at 3.)   Yookel fails to allege that it ever inquired about the operating agreement or requested to see its terms.   "If nothing else, the 'exercise of ordinary intelligence' suggests a simple inquiry by [Yookel]" into U.S. Steel's relationship with Conrail and the terms of the Rail Operating Service Agreement. *Jana L.*, 802 N.Y.S.2d at 135; *see*

*also, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 113 F.4th 247, 264 (2d Cir. 2021) (plaintiff's "failure to ask . . . about other investors' identities or strategies precludes finding that the defendants had a duty of disclosure based on superior knowledge"); *Johnson v. Levin*, 83 N.Y.S.3d 886, 887 (1st Dep't 2018) ("The special facts doctrine is not applicable as plaintiffs knew about the renovations and could have, but chose not to, inquire about them."). Because Yookel was aware of the existence of the Rail Operating Service Agreement and could have inquired into its terms, Yookel cannot show that U.S. Steel had a duty to disclose those terms under the special facts doctrine.[9]

---

[9] The court recognizes that "a party has a duty to disclose information if it has made a 'partial or ambiguous statement that requires additional disclosure to avoid misleading the other party' . . . when that party is aware that the other party is 'operating under a mistaken perception of a material fact.'" *Herzfeld v. JPMorgan Chase Bank, N.A.*, 354 F. App'x 488, 489 (2d Cir. 2009) (quoting *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir 1995)); *see also, e.g.*, *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005); *Sharbat*, 2022 WL 45062, at *9. Here, however, Yookel is proceeding on an omission theory of fraudulent inducement and does not allege that U.S. Steel made affirmatively misleading statements regarding demurrage fees. (*See, e.g.*, Am. Compl. ¶ 88 ("U.S. Steel knowingly omitted and withheld from Yookel the fact that Yookel's Ancillary Rights . . . would be subject to fees by a third party . . . .").) *See also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016) (distinguishing between "pure omissions" and "half-truths" in the federal securities context). In addition, Yookel has forfeited any argument that U.S. Steel had a duty to disclose based on a partial or ambiguous statement by failing to raise that theory in its opposition. In any event, the court concludes that Yookel fails to state a claim based on this theory because (1) consulting federal law, rather than additional disclosure by U.S. Steel, could have alerted Yookel to the prospect of demurrage fees, and (2) Yookel fails to allege that U.S. Steel knew that Yookel was relying on a mistaken perception of demurrage fees. (*See, e.g.*, Am. Compl. ¶ 92 (alleging only that U.S. Steel intended for Yookel to rely on its omission regarding demurrage fees, not that U.S. Steel knew Yookel in fact relied upon it).)

## VI.   Leave to Amend

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "it is well established that leave to amend a complaint need not be granted when amendment would be futile." *Ruderman v. Liberty Mut. Grp., Inc.*, 2022 WL 244086, at *2 (2d Cir. Jan. 27, 2022) (quoting *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003)).

"Given the terms of the parties' contract, any amendment" to Yookel's claims for breach of contract and a declaratory judgment would be futile. *Banco Santander (Brasil), S.A. v. Am. Airlines, Inc.*, 2021 WL 4820646, at *6 (E.D.N.Y. Oct. 15, 2021). Having reviewed the plain language of the Real Estate Agreement and the Rail Easement, a second amended complaint could not change the court's conclusion that neither agreement entitles Yookel to recoup demurrage fees from U.S. Steel. *See, e.g.*, *SING for Serv., LLC v. DOWC Admin. Servs., LLC*, 2022 WL 36478, at *23 (S.D.N.Y. Jan. 3, 2022) (finding leave to amend futile when "the text of the [contracts] preclude[d]" the relief sought).[10] Similarly, a second amended complaint could not alter the fact that the parties' rights and obligations are governed by the Real Estate Agreement and therefore Yookel may not assert a duplicative unjust enrichment

---

[10] Although Yookel offers to allege additional facts surrounding the purported termination of its ancillary rights in 2013 (*see* Pl.'s Opp'n at 26-27), the court has not relied on the purported termination for the reasons explained above.

claim.  *See, e.g.*, *Hassan v. Fordham Univ.*, 533 F. Supp. 3d 164, 169-70 (S.D.N.Y. 2021).

Finally, amending Yookel's fraudulent inducement claim to specifically allege that U.S. Steel "never disclosed the terms" of the Rail Operating Service Agreement (Pl.'s Opp'n at 27) would not change the court's conclusion that those terms could have been discovered by Yookel through the exercise of due diligence.  *See, e.g.*, *Xerox Corp. v. JCTB Inc.*, 2018 WL 5776423, at *9 (W.D.N.Y. Nov. 2, 2018).  Despite the court's directive at the pre-motion conference to specifically brief the question of leave to amend, Yookel's opposition offers no new facts or arguments that could lead the court to find that U.S. Steel had a duty to disclose the terms of the Rail Operating Service Agreement or additional details about its relationship with Conrail.  *See, e.g.*, *Flowers v. Conn. Light & Power Co.*, 2021 WL 5564085, at *2 (2d Cir. Nov. 29, 2021) ("Leave to amend may be deemed futile where the 'proposed amendments would fail to cure prior deficiencies or to state a claim.'" (quoting *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012))).  The court thus concludes that leave to amend would be futile for all of Yookel's claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion for judgment on the pleadings is GRANTED.  The Clerk of Court is

respectfully directed to enter judgment in favor of Defendant and

close this case.

SO ORDERED.


/s/ Kiyo A. Matsumoto
Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York


Dated:    February 23, 2022
          Brooklyn, New York